RIVERA, J. (dissenting).
**272 *868 Defendant Jaime Lopez-Mendoza claims that he was denied effective assistance of counsel because his trial attorney pursued a defense after the People forewarned him it was clearly disproven by surveillance video provided to counsel in discovery. The record establishes that counsel pursued a theory explicitly contradicted by video evidence and there can be no strategic reason for adoption of a course of action with no hope of success. Therefore, I would reverse defendant's conviction and grant him a new trial. The majority fails to render a decision on counsel's effectiveness, concluding only that the trial record is inadequate to decide the issue and that the merits can be explored in a CPL 440.10 post-conviction proceeding. However, even accepting the majority's view of what counsel may have intended, there is no way to rationalize counsel's choice.
***574 Every defendant has a constitutional right to the effective assistance of trial counsel ( Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 [1984] ; People v. Benevento, 91 N.Y.2d 708, 712, 674 N.Y.S.2d 629, 697 N.E.2d 584 [1998] ; People v. Baldi, 54 N.Y.2d 137, 444 N.Y.S.2d 893, 429 N.E.2d 400 [1981] ). This includes counsel's exercise of informed professional judgment in choosing the proper course of the defense ( People v. Colville, 20 N.Y.3d 20, 32, 955 N.Y.S.2d 799, 979 N.E.2d 1125 [2012] ). With few fundamental exceptions for decisions that belong solely to a defendant, counsel is responsible for determining how best to represent the client (see People v. Hogan, 26 N.Y.3d 779, 786, 28 N.Y.S.3d 1, 48 N.E.3d 58 [2016] [collecting cases]; People v. Colon, 90 N.Y.2d 824, 825-826, 660 N.Y.S.2d 377, 682 N.E.2d 978 [1997] [decisions belonging to a defendant are those "such as 'whether to plead guilty, waive a jury trial, testifying in [their] own behalf or take an appeal' "], quoting People v. White, 73 N.Y.2d 468, 478, 541 N.Y.S.2d 749, 539 N.E.2d 577 [1989] ). "If defense counsel solely defers to a defendant, without exercising [counsel's] professional judgment, on a decision that is 'for the attorney, not the accused, to make' because it is not fundamental, the defendant is deprived of 'the expert judgment of counsel to which the Sixth Amendment entitles [the defendant]' " ( Hogan, 26 N.Y.3d at 786, 28 N.Y.S.3d 1, 48 N.E.3d 58, quoting Colville, 20 N.Y.3d at 32, 955 N.Y.S.2d 799, 979 N.E.2d 1125 ).
To establish a claim of ineffectiveness, a defendant "must demonstrate the absence of strategic or other legitimate explanations for counsel's alleged failure" ( People v. Wragg, 26 N.Y.3d 403, 409, 23 N.Y.S.3d 600, 44 N.E.3d 898 [2015], citing People v. Satterfield, 66 N.Y.2d 796, 799-800, 497 N.Y.S.2d 903, 488 N.E.2d 834 [1985] ). "The core of the inquiry is whether defendant received 'meaningful representation' " ( Benevento, 91 N.Y.2d at 712, 674 N.Y.S.2d 629, 697 N.E.2d 584 ; see also Baldi, 54 N.Y.2d at 147, 444 N.Y.S.2d 893, 429 N.E.2d 400 ). "As long as the defense reflects a reasonable and legitimate strategy under the circumstances and evidence presented, even if unsuccessful, it will not fall to the level of ineffective assistance" ( Benevento, 91 N.Y.2d at 712-713, 674 N.Y.S.2d 629, 697 N.E.2d 584, citing People v. Lane, 60 N.Y.2d 748, 750, 469 N.Y.S.2d 663, 457 N.E.2d 769 [1983] ). "The test is reasonable competence, not perfect representation. However, that test cannot be so weak as to deny a defendant adequate due process" ( People v. Oathout, 21 N.Y.3d 127, 128-129, 967 N.Y.S.2d 654, 989 N.E.2d 936 [2013] [internal citations and quotation omitted] ). "Essential to any representation, and to the attorney's consideration of the best course of action on behalf of the client, is the attorney's investigation of the law, the **273 *869 facts, and the issues that are relevant to the case" ( People v. Oliveras, 21 N.Y.3d 339, 346, 971 N.Y.S.2d 221, 993 N.E.2d 1241 [2013] ; see also People v. Droz, 39 N.Y.2d 457, 462, 384 N.Y.S.2d 404, 348 N.E.2d 880 [1976] ["(I)t is elementary that the right to effective representation includes the right to assistance by an attorney who has taken the time to review and prepare both the law and the facts relevant to the defense"] ). Based on this investigation, ***575 counsel must "determine if matters of defense can be developed, and [ ] allow [ ] time for [counsel's] reflection and preparation for trial" ( People v. Bennett, 29 N.Y.2d 462, 466, 329 N.Y.S.2d 801, 280 N.E.2d 637 [1972] ). Inherent to the nature of legal representation and counsel's obligations to the client, is the requirement that counsel both obtain relevant materials and review and consider their application to the unique facts of a defendant's case, applying counsel's expertise to the task. While counsel may decide amongst alternatives, counsel may not fail to adequately investigate and then adopt "a 'strategy' 'born in the blind'-one [that counsel] admittedly pursued without benefit of" matters revealed in the course of counsel's investigation ( Oliveras, 21 N.Y.3d at 347, 971 N.Y.S.2d 221, 993 N.E.2d 1241 ).
An ineffective assistance of counsel claim may be raised for the first time on direct appeal ( People v. Jones, 55 N.Y.2d 771, 773, 447 N.Y.S.2d 242, 431 N.E.2d 967 [1981] ). In such a case, the inquiry is simply whether there is a sufficient record to support the claim ( id. ; see People v. Brown, 45 N.Y.2d 852, 853, 410 N.Y.S.2d 287, 382 N.E.2d 1149 [1978] ).
Here, the prosecutor argued in her opening statement that the evidence would show that the door to the victim's hotel room did not fully lock after defendant helped the victim and her boyfriend inside, permitting defendant to later reenter the room and sexually assault the victim while she was unconscious. The prosecutor also told the jury that the evidence would show the time frame for the attack, that the victim identified defendant as her attacker immediately after the assault and that, while defendant confessed to having consensual sex with the victim after he opened the door for her and her boyfriend, his claim was disproved by the evidence.
In his opening statement, defense counsel summarized "what [he] expected the evidence to show and where it may come from." He argued that the evidence would establish that the victim, drunk and under the influence of drugs, falsely accused the defendant because she was embarrassed by their sexual encounter and was "panicking over things like pregnancy, sexual disease, her boyfriend figuring out she did something." Counsel maintained that the evidence would show "much of her story makes no sense. It's unbelievable." Counsel proposed a different version of the events from that presented by the prosecutor, informing the jurors that they "will learn from the defendant" that the victim was "in an amorous mood" when defendant opened the door and that she initiated the sexual encounter. He told the jury that defendant "goes in with her, ***576 and he has sexual activity with her. He used a condom, and when it was over he left the room." Counsel told the jurors "we'll give you evidence" to rebut the People's theory that defendant reentered the room and to establish that "the defendant [was] in a different part of the hotel" during the time when the victim claimed she was assaulted.
At trial, the prosecutor sought to play excerpts from the hotel surveillance video. During a bench conference, the prosecutor explained that the video would refute defense counsel's opening statement because it would show the jury that defendant was in a different part of the hotel at the time **274 *870 when counsel told the jury the victim had invited defendant into her room. The prosecutor informed the court that she had told defense counsel a month earlier that the video established defendant's story was not true. Defense counsel did not dispute that the prosecutor had told him about the import of the video, instead responding that it was his "understanding that there [were] no surveillance videos on the guest floors" which is what he "ha[d] been told ..." The court asked defense counsel directly if he had seen the video. Counsel responded yes, that he was given "like a hundred gigabytes of video" but that he "wasn't given the camera numbers for the time periods for" the video the prosecutor wanted to play and he "would like to review those." The prosecutor responded, that defense counsel had requested "the camera angles and specific time period when the victim and her boyfriend appeared because [counsel] didn't know what they looked like, and that ... was a reasonable request, so I gave him those particular time slots. However, I don't have to tell him what his client looks like."
The court asked defense counsel directly: "Okay. Did you receive videotapes or not?" Counsel responded that it was not a tape but a hard drive with over a hundred gigabytes. The court reiterated, "That's not my question. My question is, did you receive it?" Counsel responded, "I didn't see what [the prosecutor is] talking about." After again being asked directly by the court if he had received all the surveillance video, counsel confirmed that he had, but he wanted to know "in advance which cameras and time periods [the prosecutor is] talking about." The prosecutor twice confirmed that she had provided the entire video surveillance to defense counsel. She had taken the relevant portions of the video that she would be seeking to introduce from the master video she gave to defense counsel and put it on a separate DVD to play for the jury. When the ***577 court asked defense counsel why he was objecting to the prosecutor's request for defendant to stand during the playing of the video, counsel stated, "I would like to be provided, first, with the information which cameras and timeframes, all these excerpts are from, and I would like to review them before we make a final decision on that." The prosecutor responded, "I had to watch hours of these surveillance videos just to look for the defendant ... I don't have to do this work for [defense counsel]. I don't know why he didn't." The prosecutor continued, "He should have watched the videos, especially in light of the fact that we had a bench conference, and I told him that I saw it, that [defendant's] grand jury testimony was not accurate, was not truthful because we saw the defendant in these other areas when he was supposedly having sex with the victim." Defense counsel said nothing to refute the prosecutor's repeated claims to the court that she had previously informed counsel of the video's significance at a bench conference. Nor did he respond to the prosecutor's allegation that he did not watch the videos after that conversation.
The court granted the People's request to have defendant stand while the video was played. The video showed defendant getting off an elevator in the basement of the hotel at 2:40 a.m.-less than three minutes after the electronic key record established that defendant helped the victim and her boyfriend into their hotel room. The video showed defendant leaving the hotel at 2:42 a.m. and returning at 3:09 a.m. He went into the area by the service elevator in the hotel's basement at 3:11 a.m., then was off camera until 3:38 a.m., when he again appeared on the basement's camera. After the prosecutor's case-in-chief and after calling his defense **275 *871 witnesses, counsel informed the court that defendant was not going to testify.
In his closing statement, counsel addressed the fact that defendant did not testify: "Now, in my opening remarks I mentioned to you that if the defendant testified you might learn certain things. Obviously, he hasn't testified. Anything I said about that is not evidence. It is not before you. It is not to be considered. It is not part of your deliberations." As in his opening statement, counsel argued that the victim lied, and her story was incredible. He suggested that the jury might want to review the surveillance video during its deliberations and contended that the video did not substantiate the prosecutor's timeline of the attack because it did not show how defendant exited the basement and got to the victim's floor. Counsel ***578 then argued that defendant said, "something happened voluntarily" and the DNA showed only contact between defendant's mouth and the victim's breast. Counsel returned to the version of events he outlined in his opening statement to argue that the victim "was in an amorous mood," "open[s] the door and starts soliciting [defendant] and bring him in, trying to get him to take off her clothing. And that's the activity in which the defendant had a sexual contact with her breasts in the minute or two timeframe that happened."
The prosecutor's summation countered that this was not a case of consensual sex. She reminded the jury that defendant admitted to the police he had sex with the victim, and that defense counsel's opening statement confirmed the same. She repeated how counsel's opening promoted a story that defendant had been invited by the victim to come inside the hotel room after opening the door, defendant had sex with her, and that he used a condom. The prosecutor played back parts of the surveillance video, showing defendant in the basement "less than two minutes after he helps the couple into the room. It is impossible for him to have had any sexual contact with [the victim] during that period." Emphasizing the point further, she stated, "there is no way for the defendant to ... wait until [the victim's boyfriend] passes out for him to then follow [ the victim] into the room, pull down her pants, pull down his pants and have sexual intercourse and be in the basement all in two minutes. That's physically impossible." In response to counsel's argument that there was no footage showing how defendant went from the basement to the victim's floor at the time the prosecutor argued the attack occurred, the prosecutor reminded the jury that the hotel general manager had testified that there are no surveillance cameras on the elevator or the guests' floors, and pointed out that defendant was off camera between 3:11 a.m. and 3:38 a.m., which fit the timeline of when the victim testified she was attacked.
Every possible reading of this record establishes that counsel pursued a defense that was certain to be proven false by the surveillance video. Indeed, the record establishes that counsel either did not view or did not understand the import of the video. Notably, counsel never disputed the prosecutor's assertions that he failed to view the video. Yet, counsel presented a theory in his opening based on a time frame of events that was affirmatively disproved by the video. After a sidebar discussion highlighting the video's significance, perhaps as a last attempt ***579 to salvage a defense, counsel abandoned the consensual sexual intercourse narrative and presented a competing theory in his summation.
No matter the analytic lens through which we view this case, all lead to the same conclusion. If counsel failed to view **276 *872 the surveillance video in its entirety or the portion that showed defendant's version of events was untrue, then counsel was ineffective for failing to properly investigate the case ( Oliveras, 21 N.Y.3d at 348, 971 N.Y.S.2d 221, 993 N.E.2d 1241 ). If he viewed the portion of the video showing defendant in the basement-a highly suspect proposition given that he failed to dispute the prosecutor's allegation that he failed to do so-and nevertheless did not appreciate that it disproved the timing of the defense narrative, then counsel was ineffective. There is no excuse for failing to view or appreciate the significance of the video given that the prosecutor had informed counsel over a month before the trial that the video established defendant was elsewhere at the exact time he claimed he engaged in consensual sex with the victim. If counsel viewed the video, understood that it showed defendant's version of the events was demonstrably false, and proceeded with a narrative that the prosecutor would easily disprove at trial, then counsel was ineffective for pursuing a defense with no chance of success and no strategic value (se Benevento, 91 N.Y.2d at 712, 674 N.Y.S.2d 629, 697 N.E.2d 584 ).
Even though the record allows for no other view of counsel's actions, the majority suggests that counsel may have had some unidentifiable strategy that resulted in keeping defendant's grand jury testimony from the jury (majority op. at 572, 106 N.Y.S.3d at 270-71, 130 N.E.3d at 866-67). This ignores the core ineffectiveness of counsel's representation because if counsel pursued a strategy to keep out this testimony so that he could argue the sexual contact was at some time after defendant helped the victim into her room, such "strategy" would not have been reasonable as a constitutional matter ( Benevento, 91 N.Y.2d at 712-713, 674 N.Y.S.2d 629, 697 N.E.2d 584 ).[1]
***580 Assuming counsel did or said something, or chose silence-all within the proper bounds of advocacy-which kept the testimony out, counsel still undermined the defense. First, if the prosecutor did not introduce the grand jury minutes because she believed defendant would testify, counsel had already recited the exact same false narrative to the jury. Although opening statements are not evidence, the jurors could not simply ignore that they heard from defendant's own lawyer that defendant claimed he had sex with the victim right after helping her inside the hotel room. Actually, counsel provided an opportunity for the prosecutor's final reminder to the jury of this version, which served to undermine counsel and defendant's credibility in the eyes of the jurors.
**277 *873 When counsel promised defendant's testimony and failed to deliver by the end of trial, the prosecutor was able to comment on this failure in summation. If counsel had not promised defendant's testimony-by saying instead that the evidence would show that the victim's version was not true-then the prosecutor would not have been permitted to draw the jury's attention to the fact that defendant did not take the stand. Second, it would be of limited value, if not completely in vain, for counsel to intentionally mislead and confuse the jury with competing defense theories, all to keep out a narrative counsel himself presented to the jury. Indeed, it would mean counsel pursued a perilous strategy that risked the jurors' distrust and ire, and irrevocably damaged the chances for an acquittal. The majority's conclusion that a viable strategy may have guided counsel's actions fails to explain counsel's presentation of two separate diametrically opposed defenses. There is no way to harmonize counsel's opening statement that defendant and the victim had consensual sexual intercourse with his closing argument pivoting to an entirely different defense.
In this case, which turned on the People and defendant's competing narratives of the sexual attack, counsel's actions were devastating to the defense. There is no reasonable strategy ***581 that renders this representation meaningful (see People v. Turner, 5 N.Y.3d 476, 480, 806 N.Y.S.2d 154, 840 N.E.2d 123 [2005] ["(O)ur decisions, and the United States Supreme Court's, have recognized that there may be cases in which a single failing in an otherwise competent performance is so 'egregious and prejudicial' as to deprive a defendant of (a) constitutional right"], quoting People v. Caban, 5 N.Y.3d 143, 152, 800 N.Y.S.2d 70, 833 N.E.2d 213 [2005] ); see also People v. Harris, 26 N.Y.3d 321, 326-327, 22 N.Y.S.3d 393, 43 N.E.3d 750 [2015] [counsel ineffective because defense strategy was not reasonable] ). I dissent.[2]
Chief Judge DiFiore and Judges Stein, Fahey, Garcia and Feinman concur.
Judge Rivera dissents in an opinion.
Order affirmed.

The majority's focus on the fact that defense counsel elicited from the EMT that the victim had stated the assault occurred "moments" after the victim entered the hotel room (majority op. at 572, 106 N.Y.S.3d at 270-71, 130 N.E.3d at 866-67), overemphasizes a single notation in the EMT report and ignores that this was an unrealistic interpretation of the victim's statement. As the prosecutor argued in summation, if the victim told the EMT she was raped "moments" after being let into the room, that statement was not inconsistent with the timeline since the victim had immediately fallen asleep and was not clear on how much time had passed before the assault. Nevertheless, counsel could have elicited this testimony to further challenge the victim's credibility without promising the jury that defendant would testify to a version of events counsel knew to be demonstrably false, and then abandon that version in summation. As defendant is entitled to "meaningful" representation, counsel's ability to elicit evidence helpful to the defendant does not excuse counsel's failure to adequately prepare by watching the surveillance video nor (assuming counsel watched the video) does it explain counsel's presentation to the jury of two irreconcilable defense theories while simultaneously destroying his own credibility with the jury.

I agree with the majority's conclusion that any error in the introduction of the DNA evidence was harmless (majority op. at 573, 106 N.Y.S.3d at 271, 130 N.E.3d at 867).